# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **LUIS RODRIGUEZ** | **CIVIL ACTION** |
| **VERSUS** | **NO. 06-815** |
| **N. BURL CAIN, WARDEN** | **SECTION "C" (4)** |

## ORDER AND REASONS

This matter is before the Court on a petition for writ of habeas corpus by Luis Rodriguez, seeking relief pursuant to 28 U.S.C. § 2254.  The petitioner raises nine claims for relief from his October, 1999 conviction of one count of second degree murder and one count of attempted second degree murder.  Upon a thorough review of the trial, direct appeal, and post-conviction records, the habeas petition, traverse, memoranda, and applicable law, the Court has determined that petitioner's habeas corpus petition is without merit. For the reasons set forth below, this petition is DENIED WITH PREJUDICE.

## I. BACKGROUND AND PROCEDURAL HISTORY

The petitioner is a prisoner of the state confined to the Louisiana State Penitentiary in Angola, La.   Fed. Rec. Doc. 1  He filed this federal application for writ of habeas corpus dated

January 25, 2006.  *Id*. at 48.   Petitioner was found guilty of one count of second degree murder

in violation of LA. REV. STAT. § 14:30, and one count of attempted second degree murder in

violation of LA REV. STAT. 14:(27)30.1 in the 24th Judicial District Court for the Parish of

Jefferson, State of Louisiana on October 1, 1999.   State Rec. Vol. 6 at 111.  He was originally

sentenced, on February 22, 2000,  to life imprisonment on count one and fifty years at hard labor

on count two, with both sentences to run concurrently and without the benefit of parole,

probation, or suspension of sentence.  State Rec. Vol. 6 at 135, Vol. 19 at 3303-3304.  After the

State filed a multiple offender bill of information relative to count two, the trial court adjudicated

the petitioner a second felony offender on January 18, 2001.  The court vacated petitioner's

original sentence as to count two and re-sentenced him to seventy-five years at hard labor

without benefit of probation or suspension of sentence.  State Rec. Vol. 6 at 162, Vol. 19 at

3320-3321.

      The following facts are taken from the Statement of Facts of the Louisiana Court of

Appeal, Fifth Circuit :

> On the night of August 31, 1997, Danny Heiness, who was eighteen years old,
> was shot in the head in the parking lot of Don Carter's bowling alley in Kenner.
> Another boy, Danny Landry, was shot in the hand. According to Dr. Frazier
> McKenzie, Heiness sustained a perforating wound to the brain. The doctor
> explained that the bullet had entered in the back of the head and exited the front.
> Dr. McKenzie opined that the shot was fired at a distance more than two feet from
> Heiness.
>
> Detectives Thomas Powell and Mark Ortiz responded to the scene of the shooting
> at approximately 11:00 p.m. Detective Powell testified that the police had
> retrieved a .45 caliber shell casing from the scene. The police also interviewed
> several of the witnesses, four of whom believed that they could identify the

shooter. Detective Powell stated that at some point on September 1, 1997, the police developed a lead. Detective Powell compiled a photographic lineup that contained defendant's photograph along with several others. Detective Ortiz showed the lineup to three of the four witnesses, Daniel Landry, Jeffrey Clark, and Ernie Gardner. The first two positively identified the defendant as the shooter, while Ernie Gardners identification was classified as "tentative." Detective Ortiz testified that he reported his results to Detective Powell, who then secured a warrant for the defendant's arrest and search warrants for the defendant's vehicle and residence. While executing the search warrants, the police seized a blue knit "Tommy Hilfiger" cap, a pair of "London & London" denim overalls, a gold cross, and several photographs, all of which were subsequently entered into evidence. Both Detectives Ortiz and Powell stated that some of the photographs depicted the defendant wearing a cross around his neck, and making hand signals that officers believed were "gang signs."

After his arrest, defendant waived his constitutional rights and gave a statement in which he admitted that he went to Don Carter's at approximately 9:00 p.m. that night, but left at approximately 10:15 p.m. Defendant denied being affiliated with a gang and acknowledged that he had heard about the shooting on television.

Daniel Landry, who was twenty-one at the time of trial, testified that he and Heiness went to the bowling alley that night to play pool. Other friends of theirs, Chucky Brower, Jeffrey Clark, and Robert Craig, were also at the bowling alley that night. According to Landry, Chucky was a member of the "31st Hoover" gang. Landry related that a person whom he did not recognize attempted to start a fight with Chucky, who was wearing a "31st Hoover" necklace. A short while later, the person and Chucky shook hands, which calmed the situation. After this incident, however, five or six Spanish males kept walking by him and his friends. A few minutes later, Heiness told Landry that someone asked Heiness to come outside. When Landry and Heiness walked outside, there was a group of people "smiling and laughing." Heiness asked who wanted him outside, but no one responded. Heiness and Landry returned inside. Later, Heiness and Landry went to the parking lot to obtain some change from Heiness car for the pool table. While Heiness was getting change, Landry saw a man, whom he later identified as the defendant, walking around the parking lot. Landry told Heiness that he was worried that a fight might ensue, and Heiness replied, "Well, if we get in a fight, were just going to have to handle our business."

As Heiness and Landry walked toward the bowling alley, the rest of their friends were walking out into the parking lot. Landry said that he saw the defendant walk behind the group. Landry told his friends, "You all watch out, we might get into a

fight." One of his friends responded that no one was going to fight them, and Landry said, "All right." Shortly thereafter, Robert Craig, who was the last in the group, told them to stop walking. Landry looked behind him and noticed that the defendant was four or five feet away from Craig. According to Landry, the defendant said, "You about handling business?" Craig replied, "We what?" Then Landry saw the defendant pull a gun from his overalls, cocked it, and then fired. Landry said that he and Craig ducked and began running. When they got a short distance away, they noticed Heiness was not there. They began returning to the scene, but were intercepted by a police officer on the way to the scene. Landry was shot in the hand, and he found out later that his friend had been mortally wounded.

Landry said that he saw the shooter's face clearly, and described him as a "black male, skinny," wearing blue jean overalls with the right strap hanging down, a black and blue shirt, with a black "cango" hat. Also, Landry said the shooter was wearing a gold cross, "with a little Jesus in the middle." Landry identified the pendant that was seized from the defendant's home as the one that the shooter wore. However, Landry said that the hat seized from defendant's home was not a "cango" hat.

According to Landry, he could not completely see the shooter's hairstyle because of the hat, but stated that the shooter's hair was shaved on the sides. He did not remember seeing a pony tail or pig tail. Further, Landry said that he thought the shooter was wearing one diamond earring, but was not certain. Landry stated that he had positively identified the defendant from the photographic lineup that he was shown, and he acknowledged that he had no doubts that the defendant was the shooter. When shown a photograph of Jorge Serrano, Landry said that he did not see that person at the bowling alley that night.

Landry clarified that Chucky was in a gang, but that none of the rest of his friends who were there that night was in a gang. According to Landry, Robert Craig considered himself to be a gang member, but Landry did not. Twenty-year-old Jeffrey Clark related essentially the same account of the events immediately preceding the shooting. Additionally, Clark said that the defendant was with the person who had made a remark to Chucky earlier in the evening. He too denied that any of the group other than Chuck was a gang member, and that Chuck belonged to the "31st Hoover" Cripp gang. Clark said that he saw the shooter clearly, since Clark was only ten feet from him. According to Clark, the shooter wore overalls with the right strap hanging down. Clark identified the pendant seized from the defendant's residence as the one worn by the shooter. Additionally, Clark stated that the shooter wore a "blue denim cango hat" that was turned around backwards, and that the shooter had "like a braid going down

4

the back of his neck."

When the prosecutor showed Clark the photograph of defendant taken at the time of his arrest, Clark acknowledged the defendant did not have a braid. However, Clark denied that the fact defendant did not have a braid at the time of his arrest failed to change his mind that the defendant was the shooter. When shown a photograph of Serrano, Clark was not sure if he had seen Serrano that night. But, Clark stated that Serrano did not resemble the defendant. Finally, Clark stated that he was 90 percent certain the defendant was the shooter when he identified him from the photographic lineup, but after seeing the defendant in person at a prior motion hearing, Clark was 100 percent sure of his identification. Clark also identified the defendant in court.

Robert Craig corroborated much of the foregoing testimony leading up to the shooting. Craig added that the defendant asked whether Craig was a Cripp. When Craig answered affirmatively, the person uttered an expletive and fired the gun. Craig said that the shooter wore a maroon long-sleeved shirt, overalls with one of the straps unhooked and a black "cango" hat. Craig identified the pendant seized from the defendant's residence as the one worn by the shooter. According to Craig, the shooter had a "little rat tail" hanging down. However, he said that the fact that the defendant did not have a rat tail in his arrest photograph did not change his identification of the defendant as the shooter. When shown a photograph of Serrano, Craig denied that he had seen Serrano at the bowling alley. Further, Craig said that Serrano did not resemble the defendant.

Craig believed that the other guys in the parking lot were gang members because they were all "Spanish" and the Latin Kings gang was near Don Carters. Finally, Craig said that he was no longer a member of a gang.

Ernie Gardner testified that he was in the bowling alley that night for a birthday party, but did not know Landry, Heiness, Craig or Clark. However, Gardner said he saw the shooting from approximately 100 feet away. According to Gardner, the shooter wore overalls, a "cango" hat, a white and blue denim long-sleeved shirt, and a gold and silver cross. Gardner stated that he was not positively able to identify the shooter from either a photographic lineup or a physical lineup. Garner acknowledged that he could not remember which photograph he had chosen. Regarding the physical lineup, Gardner noted that, although he was not positive about his identification of the defendant, he eliminated the other subjects. When shown the pendant seized from defendant's home, Gardner replied that it "could be" the one, but he was not sure. When shown a photograph of Serrano, Gardner stated that he did not recognize the person, but that the person did not look like the shooter. Hans Sinha, a former assistant district attorney, testified on behalf of

5

the State that he had presented the defendant's case to the grand jury. Further, he said that he had arranged the physical lineup attended by Ernie Gardner. Mr. Sinha acknowledged that the defendant's attorney, Martin Regan, wrote a letter requesting that Serrano be included in the physical lineup. However, Mr. Sinha did not believe that the lineup would have been fair because Serrano and defendant did not resemble each other. Accordingly, Mr. Sinha declined to include Serrano among the persons in the lineup.

The State's theory of the case was that the defendant and Jorge Serrano had conspired to have Serrano claim responsibility for the murder because Serrano was already serving a 20-year sentence at hard labor on a rape conviction. To that end, letters written in Spanish from Serrano to the defendant and vice versa, were seized from their respective prison cells. The letters were translated into English, and Juan Blanco, an expert Spanish translator, testified that the translations were accurate. Further, Mr. Blanco read each translated letter to the jury. The letters reflect that the defendant considered Serrano his brother, and the defendant expressed his affection for Serrano in the letters. In one of the letters, defendant inquired whether Serrano still wanted to help the defendant, and in another, he asked whether Serrano had the tattoo with the "five points" made. In the same letter, defendant urged Serrano to "have everything memorized when the party begins." In one of Serrano's letters to the defendant, he responds that he is going to have two tattoos made, "the crown and the five points." He says that he is ready to go to court with the defendant and "begin the fight." Just before resting, the State had Serrano display his tattoo to the jury.

Through an interpreter, Jorge Serrano testified that he committed the murder, not the defendant. Serrano related that the defendant was not at the bowling alley at the time of the shooting. Serrano claimed that he acted in self-defense because the victim and his friends wanted to kill him in light of his status as a Latin Kings gang member. Serrano related that he fired the gun when one of the victim's friends reached into his clothes. Believing that the person was reaching for a gun, Serrano fired at the "biggest one in the group." Serrano stated that a friend, who was not the defendant, drove him from the scene in a black Nissan Altima. An hour later, another friend, whom Serrano also refused to name, drove him to Miami where Serrano stayed with another friend, whom he refused to name. Serrano returned to Louisiana three months later when he was arrested for allegedly raping his former girlfriend. When he was brought to jail, Serrano saw the defendant there. Serrano learned that the defendant had been arrested for the crime he had committed. Serrano denied that he was lying in order to save the defendant from prison. Further, Serrano stated that he was brought to the district attorneys office and made a statement that he had committed the offense. When he was asked whether he wanted to speak with a lawyer, he answered

6

affirmatively. Serrano explained that he did not say anything else because no lawyer was present on his behalf. Finally, Serrano claimed that he sold the gun to "Felix," who was later identified as Felippe Gomez. The defense established that the .45 caliber casing found at the scene was fired from a gun that was later unlawfully discharged in a bar by Felippe Gomez, with whom both the defendant and Serrano were acquainted.

Christy Mora testified that she was at Wendy's near the bowling alley and heard the gunshot. She stated that she noticed a person carrying a weapon enter the passenger's side of a black Nissan Altima. Ms. Mora said that she could not see the person's face, however. The defense also called Frank DeSalvo, who acknowledged that he had represented the defendant earlier in the case. Mr. DeSalvo stated that he was informed that someone else had committed the shooting, and met with a person in that regard at the prison. However, Mr. DeSalvo testified that the person said nothing. The defendant admitted that he had been at the bowling alley earlier on the evening of the shooting but stated that he arrived at his home on Baylor Street at approximately 10:15 p.m. Defendant denied that he committed the crimes for which he was charged. Defendant further claimed that Serrano did not act in self-defense but actually committed the crime to advance his position as a Latin Kings gang member. Defendant denied being a member of a gang, and removed his shirt to demonstrate to the jury the absence of gang tattoos. He denied owning the overalls that had been seized from his home. Defendant stated that the pants were not a man's garment, since there was no zipper in the front. Defendant denied that he and Serrano had confected a scheme by which Serrano would take responsibility for the crime. Finally, defendant claimed that he did not wear his hair in a pony tail. Rather, defendant described his hairstyle as a "poopy doo," which is characterized by more hair on top with the sides and back of the head shaved. During trial, Aida Fuentes, the defendant's "common-law" wife, testified defendant was not at home earlier on the evening of the shooting, but that he arrived home at approximately 10:15 p.m. The address of their home that Ms. Fuentes provided on direct examination was 231 Clemson, Apartment C in Kenner. On cross-examination, Ms. Fuentes stated she had made a mistake and that they were actually on Baylor Street at the time of the shooting. When confronted with the difference in the two addresses, Ms. Fuentes explained that she was nervous at the beginning of her testimony when she said they were living at the Clemson address.

Ms. Fuentes said that the overalls seized from her residence belonged to her sister, Julia Aguilar, who was staying with them at the time. Further, Ms. Fuentes stated that the cross that was seized was actually at the jewelry shop on August 31, 1997. Ms. Fuentes claimed that she picked up the cross on the following day, September 1, 1997. Both Ms. Fuentes and Julia Fuentes Aguilar stated that

Serrano wore his hair in a pony tail, but defendant never had.

Ms. Aguilar said that the overalls belonged to her, not the defendant, and that the defendant came home later that evening, but she was not certain of the time. Further, Ms. Aguilar claimed that the defendant had borrowed her light-blue Toyota Tercel that night. Arecio Conde, who lived across the street from Ms. Fuentes' parents, confirmed in his testimony that the defendant wore his hair short in the back.

*State v. Rodriguez*, 02-334 (La. App. 5 Cir., 2003) 839 So.2d 106, 111 -115.

Again, petitioner was convicted on October 1, 1999, and originally sentenced on February 22, 2000.  Under LA. CODE CRIM. PROC. ANN. art. 914 (West 2000), the petitioner had five days in which to move for appeal, and failed to do so.  Petitioner's conviction and sentence thus became final on March 1, 2000.  On July 21, 2000, petitioner filed a *Motion and Order for Out of Time Appeal and to Reconsider Sentence.*  State Rec. Vol. 6 at 136-37.  The trial court denied this motion on August 11, 2000, stating that his proper remedy was to file an application for post-conviction relief alleging ineffective assistance of counsel due to defense counsel's failure to move for an appeal.  *Id.* at 143.  On October 18, 2000, petitioner filed an application for post-conviction relief seeking reinstatement of his appellate rights.  *Id.* at 144-150.  The trial court granted this motion on November 20, 2000.  *Id.* at 151.

Petitioner filed a brief in the Louisiana Court of Appeal, Fifth Circuit on August 13, 2002, challenging his convictions.  State Rec. Vol. 19, Tab 16.  That court affirmed his convictions on January 14, 2003, *Rodriguez*, 839 So.2d 106, and the Supreme Court of Louisiana denied a subsequent writ application on May 30, 2003.  *State v. Rodriguez*, 03-0482 (La. 5/30/2003), 845 So.2d 1061.  The United States Supreme Court denied a petition for writ of

certiorari, filed through counsel, on October 20, 2003.  *Rodriguez v. Louisiana*, 540 U.S. 972 (2003).

On August 18, 2004, petitioner filed an application for post-conviction relief in the 24th Judicial District Court for the Parish of Jefferson, raising five claims - petitioner's third through seventh claims in this federal petition.  State Rec. Vol. 4, Tab 8.  On October 13, 2004, he filed a *Supplemental Claim to Petitioner's Original Post-Conviction Application and Reply to State's Response to Application for Post-Conviction Relief*, raising a claim of ineffective assistance of his appellate counsel - petitioner's eighth claim in his federal petition.  *Id.*, Tab 9.  On October 25, 2004, the district court denied petitioner's first [federal third] through fourth [federal sixth] claims based on his failure to raise them on appeal, and denied his fifth [federal seventh] claim as repetitive and successive.  State Rec. Vol. 3, Tab 6.  On November 2, 2004, the district court denied relief on the ineffectiveness of counsel claim (raised in petitioner's October 13 filing) on the grounds of *res judicata* and repetitiveness.  *Id.*, Tab 7.  The Court of Appeal, Fifth Circuit denied relief on December 15, 2004, finding no error in the October 25 and November 2, 2004 rulings.  *State ex rel. Rodriguez v. State*, 04-1421 (La.App. 5 Cir. 12/15/04(unpublished decision).  State Rec. Vol. 5, Tabs 11-12.  The Supreme Court of Louisiana thereafter denied his writ application thereto on December 16, 2005.  *State ex rel. Rodriguez v. State*, 05-0410 (La. 12/16/05) 917 So. 2d 1101.  Petitioner Rodriguez filed this federal petition for writ of habeas corpus, dated January 25, 2006.

II.  PROCEDURAL REVIEW

**A. Custody Requirement**

A petitioner must be "in custody" for a federal court to entertain a petition for habeas relief. 28 U.S.C. § 2241(c); 28 U.S.C.§ 2254(a).  Physical incarceration satisfies the custody requirement.  *See e.g., Maleng v. Cook*, 490 U.S. 488, 491, 109 S. Ct. 1923, 1925 (1989).  Here, petitioner is incarcerated at the Louisiana State Penitentiary in Angola, Louisiana, pursuant to the conviction he is attacking.  Rec. Doc. 1.  Accordingly, this condition of the Court's subject matter jurisdiction over petitioner's claim for relief is satisfied.

**B. Venue**

Under 28 U.S.C.A. § 2241(d), venue lies in the district in which the petitioner is incarcerated or the district from which his conviction or sentence was obtained.  Petitioner is incarcerated at the Louisiana State Penitentiary in Angola, Louisiana, which is in West Feliciana Parish, a parish that falls within the Middle District of Louisiana under 28 U.S.C. § 98(b). However, petitioner was convicted and sentenced in Jefferson Parish, which under 28 U.S.C. § 98(a) falls within the Eastern District of Louisiana.  Therefore, venue lies for this petition under 28 U.S.C.A § 2241(d).

**C. Exhaustion**

Petitioner's claims are exhausted as required by AEDPA. Indeed, the State concedes exhaustion.  Rec. Doc.11, at 4.  Generally, exhaustion of adequate state remedies is a "condition precedent to the invocation of federal judicial relief under [28 U.S.C.§ 2254]." *Preiser v. Rodriquez*, 411 U.S. 475, 489 (1973). To satisfy the exhaustion requirement, the entirety of the

factual allegations and legal theories presented to the federal court must have been presented in a procedurally proper manner to the highest state court, here the Louisiana Supreme Court. *See e.g., Anderson v. Harless*, 459 U.S. 4, 6 (1982) (holding a habeas petitioner must have "fairly presented" to the state courts the "substance" of his federal habeas corpus claim (quoting *Picard v. Connor*, 404 U.S. 270, 275 (1971); *Yohey v. Collins*, 985 F.2d 222, 226 (5th Cir. 1993); *Rose v. Lundry*, 455 U.S. 509 (1982).  It is important to note that the issues in a habeas petition could have been presented to the highest state court on direct appeal, or in a state post-conviction proceeding; either is sufficient and both are not required. *Brown v. Allen*, 344 U.S. 443, 447 (1953); *Myers v. Collins*, 919 F.2d 1074, 1075-77 (5th Cir. 1990).  The requirement of exhaustion is now codified by 28 U.S.C.§ 2254(b)(1), which provides, *inter alia*, that habeas relief "shall not be granted unless it appears that (A) the applicant has exhausted the remedies available in the courts of the State . . . ."  The other statutory provisions providing exceptions to the exhaustion rule are inapplicable here.

Petitioner presents nine claims for review in his federal habeas petition as listed below. These claims were raised in his application for writs of certiorari and review to the Louisiana Supreme Court on his direct appeal or on his application for post conviction relief.  Accordingly, petitioner has satisfied AEDPA's exhaustion requirement.

### D. Timeliness

The state submits that the petition is untimely, and after reviewing the record the Court agrees.  The Anti-terrorism and Effective Death Penalty Act of 1996[1] (AEDPA) requires that a

---

[1] Pub. L. 104-132, Apr. 24, 1996, 110 Stat. 1214.

habeas petitioner bring his or her 28 U.S.C.§ 2254 action within one year of the date on which

his or her conviction or sentence becomes final.[2]  AEDPA's one-year statute of limitations is

tolled for the period of time during which a properly filed application for state post-conviction

relief or other collateral review attacking a conviction or sentence is pending in state court. 28

U.S.C.§ 2254(d)(2); *Fields v. Johnson*, 159 F.3d 914 (5th Cir. 1998).  "A  properly filed

application is one submitted according to the state's procedural requirements, such as the rules

governing notice and the time and place of filing." *Villegas v. Johnson*, 184 F.3d 467, 469 (5th

Cir. 1999) (*quoting Lovasz v. Vaughn*, 134 F.3d 146, 148 (3rd Cir. 1998) (internal quotations

omitted); *Williams v. Cain*, 217 F.3d 303 (5th Cir. 2000).  Finally, out of an abundance of

caution, this Court construes any tolling ambiguities in favor of a petitioner.  *See, e.g.,  Navarre

v. Stalder,* 2007 WL 1702774, *5 (E.D.La. 2007).

Ordinarily, "finality attaches when [the United States Supreme Court] affirms a

conviction on the merits on direct review or denies a petition for a writ of certiorari, or when the

---

[2] 28 U.S.C.§ 2244(d) provides:
(1) A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in
custody pursuant to the judgment of a State court.  The limitation period shall run from the latest of –
    (A) the date on which the judgment became final by the conclusion of direct review or the
    expiration of the time for seeking such review;
    (B) the date on which the impediment to filing an application created by State action in violation
    of the Constitution or laws of the United States is removed, if the applicant was prevented from
    filing by such State action;
    (C) the date on which the constitutional right asserted was initially recognized by the Supreme
    Court, if the right has been newly recognized by the Supreme Court and made retroactively
    applicable to cases on collateral review; or
    (D) the date on which the factual predicate of the claim or claims presented could have been
    discovered through the exercise of due diligence.
(2) The time during which a properly filed application for State post-conviction or other collateral review
with respect to the pertinent judgment or claim is pending shall not be counted toward any period of
limitation under this subsection.

time for filing a certiorari petition expires."  *Clay v. United States*, 537 U.S. 522, 527 (2003); *see also, Roberts v. Cockrell*, 319 F.3d 690, 694 (5th Cir. 2003) (reaching the same conclusion regarding "finality.").  Additionally, a petitioner has ninety days to file a writ of certiorari in the United States Supreme Court after a decision is rendered by the state's highest court.  SUP. CT. R. 13(1).

Here, however, petitioner failed to move for an appeal within the requisite five days of the judgment from which the appeal is taken - here his conviction - under LA.CODE CRIM. PROC. art. 914.  Thus his conviction and February 22, 2000 sentence became final on March 1, 2000.  *See State v. Counterman*, 85-0254 (La. 9/10/1985), 475 So.2d 336.  On August 11, 2000, the trial court denied his *Motion and Order for Out of Time Appeal* filed July 21, 2000, indicating that he was required to seek an out-of-time appeal through the filing of an out of time application for post-conviction relief.  He then filed an application for post-conviction relief seeking reinstatement of his appellate rights on October 18, 2000, which the court granted on November 20, 2000.

The State argues that the period between March 1, 2000, when his conviction became final, and October 18, 2000, when he "properly filed" his post-conviction relief application seeking reinstatement of his appellate rights, should not be tolled under 28 U.S.C. § 2244(d).  As a result, 231 of his 365 days under the statute of limitations elapsed during that time.  This Court agrees.[3]

---

[3] The State concedes that the statute of limitations was tolled from October 18, 2000 until the United States Supreme Court denied his petition for writ of certiorari on October 20, 2003.  Another 303 days elapsed between that date until petitioner filed his August 18, 2004 application for post-conviction relief; the statute of limitations lapsed

In *Salinas v. Dretke*, 354 F.3d 425 (5th Cir. 2004), the federal Fifth Circuit held that where a federal habeas petitioner had previously failed to timely appeal his original conviction in state courts, and subsequently regains his direct review appellate rights through a state collateral review procedure, the AEDPA limitations period is not restarted altogether.   The determination whether a state mechanism by which a petitioner obtains the right to file an out-of-time appeal is part of the direct or collateral review process is a matter of state law.  *Salinas*, 354 F.3d at 430. As with the Texas statute at issue in *Salinas*, after the period for moving for an appeal has expired under LA. CODE CRIM.PROC. art. 914, a petitioner in Louisiana has no right to seek direct review from Louisiana appellate courts.  Rather, all relief must be requested through collateral proceedings.  *Counterman*, 475 So.2d at 338-39.

In this case, the Louisiana Fifth Circuit, in denying petitioner's motion for an out-of-time appeal, indicated that his proper remedy under Louisiana law was to file an application for post-conviction relief to reinstate his appellate rights, claiming ineffective assistance of counsel. When petitioner followed this procedure, the Louisiana appellate court granted him relief from his loss of appellate rights.  As was the case for the *Salinas* petitioner in Texas, because Rodriguez' "right to file the 'out-of time' [application for PCR] is necessarily the product of state habeas review, it does not arise under the 'direct review' procedures" of the Louisiana judicial system.  *See Salinas*, 354 F.3d at 431.   Though the relief granted to petitioner from his

---

during this period.  Another 40 days elapsed between December 16, 2005, when the Supreme Court of Louisiana denied his writ application, and January 25, 2006, the date petitioner signed his federal petition.  Thus a total of 574 un-tolled days had elapsed between the date on which petitioner's conviction became final and the date of his federal petition.

14

failure to timely move for appeal by the Louisiana Fifth Circuit resulted in tolling of the period between his "properly filed" post-conviction relief application in October 18, 2000, and the period until the U.S. Supreme Court denied his writ application,[4] the period from March 1, 2000 until that time is not tolled.

As a result, petitioner Rodriguez' limitations period for filing his federal habeas petition lapsed significantly prior to January 25, 2006, the date he signed the instant petition.  In his traverse, petitioner notes that the state's own response raises the grounds for his failure to timely appeal - attorney error.[5]  The petitioner describes this as a new issue never raised prior to this stage in the proceedings, and thus requests that this Court grant him leave to expand the record "in the interests of justice and comity," this ineffectiveness of counsel issue having been "duly raised by the state."  Rec. Doc. 14, at 2 n.1.  This is more appropriately considered as a request for equitable tolling of the statute of limitations, and this Court must liberally construe the pleadings of a *pro se* petitioner.  *See, e.g., Jabir v. Ashcroft*, 2004 WL 60318 (J. Berrigan), *citing Haines v. Kerner*, 404 U.S. 519, 520 (1972); *see also United States v. Patterson*, 211 F.3d 927, 929 (5th Cir. 2000) (construing that *pro se* petitioner had sufficiently raised the issue of equitable tolling though he had not specifically made that argument); *Felder v. Johnson*, 204

---

[4] This period is tolled because during the time the Louisiana Fifth Circuit was considering his application, a "properly filed" application for state post-conviction relief "[was] pending." 28 U.S.C. § 2244(d)(2); *see Salinas*, 354 F.3d at 430 n.6.

[5] "The record indicates that counsel for the petitioner initially made an oral motion for appeal but apparently reconsidered moving for an appeal at the time because of the issue of divesting the trial court of jurisdiction relative to a possible writ application the defense was contemplating filing. (R., Vol.19, pp.3304-3307) The defense was to determine its course of action and resolve the matter by filing a written motion but evidently failed to do so (R.,Vol. 19, pp 3306-3307)." Rec. Doc. 11 at 14 n.4.

F.3d 168, 170 n.5 (5th Cir. 2000) (same).   However, this issue was clearly presented in *Salinas*, and the Fifth Circuit applied previous circuit precedent in concluding that "mere attorney error or neglect is not an extraordinary circumstance such that equitable tolling is justified."   354 F.3d at 432 (internal citations omitted).   In *Salinas*, the attorney error was clear: the petitioner spent seven months in jail unaware that his conviction had been affirmed - his attorney had prepared a letter notifying him of the result but neglected to mail it.   *Id.* at 427.   Here, the failure of Rodriguez' attorney to timely file an appeal appears to be similarly clear error.   However, Rodriguez was granted relief from this error when the Louisiana appellate court reinstated his appellate rights, and though he lost a significant portion of his limitations period due to this error (231 days), he still had a significant amount of time in which to bring a federal habeas petition. Nothing about Rodriguez' situation, at least with regards to this attorney error, suggests it is different from the error in *Salinas* such that equitable tolling is justified.

When combined with other issues raised in Rodriguez' petition, however, the petitioner's case for equitable tolling of the AEDPA limitations period becomes stronger:  in his traverse, Rodriguez also cites the challenges he faces as an applicant who has difficulty speaking, reading, and writing in English, and the erroneous advice his appellate counsel gave to him specifically regarding the statutory limitations period under AEDPA in letters at the end of his representation.   Again, while he does raise these issues, petitioner does not specifically construct them as an argument for equitable tolling.   As above, the Court will liberally construe the petition and traverse as sufficiently raising the issue of equitable tolling.

The federal Fifth Circuit has repeatedly held that the limitation period of 28 U.S.C. §

16

2244(d) is a statute of limitations that is not jurisdictional and is therefore subject to equitable tolling.  *See, e.g., Davis v. Johnson*, 158 F.3d 806, 810 (5th Cir. 1998), *cert. denied*, 526 U.S. 1074 (1999); *United States v. Wynn*, 292 F.3d 226, 230 (5th Cir. 2002).  Equitable tolling is only applied in "rare and exceptional circumstances."  *Davis*, 158 F.3d at 810.  To apply the doctrine of equitable tolling, a court looks to the facts and circumstances of each case.  *Patterson*, 211 F.3d at 931.  Equitable tolling is not upheld by excusable neglect, *Ott v. Johnson*, 192 F.3d 510, 513-14 (5th Cir. 1999), and applies principally where a petitioner has been actively misled by the opposing party concerning the course of the action or if he has been prevented in some extraordinary way from pursuing his remedies.  *Fierro v. Cockrell*, 294 F.3d 674, 682 (5th Cir. 2002).  The doctrine of equitable tolling is not applied, regardless of circumstances, where a petitioner has failed to pursue habeas relief diligently. *Cousin v. Lensing*, 310 F.3d 843, 849 (5th Cir. 2002).

Petitioner states in his traverse that he faces hardship as an applicant who possesses difficulty with speaking, reading and writing in English.  Rec. Doc. 14 at 2.  A court in this district concluded that the disproportionate level of English spoken at petitioner's correctional institution could not be said to present a rare and exceptional circumstance necessary for equitable tolling.  *United States v. Teshima-Jimenez*, 1999 WL 600326, *2 (E.D.La.) (J.Duval). In reaching this conclusion, Judge Duval noted that the Fifth Circuit has held that neither a plaintiff's unfamiliarity with the legal process nor his lack of representation during the applicable filing period merits equitable tolling.  *Id., citing Turner v. Johnson*, 177 F.3d, 390, 392 (5th Cir. 1999).  "It is irrelevant whether the unfamiliarity is due to illiteracy or any other

reason." *Turner*, 177 F.3d at 392 (internal citation omitted).  In addition, "ignorance of the law,

even for an incarcerated *pro se* petitioner, generally does not excuse prompt filing." *Fisher v.

Johnson*, 174 F.3d 710, 714 (5th Cir. 1999).  A district court in Texas similarly concluded that an

inability to speak or read the English language is a disability common to many incarcerated

persons and as such it does not warrant equitable tolling.  *United States v. Polbo-Torres*, 2005

WL 81725, *2 (N.D. Tex).  The Sixth Circuit has concluded that "an inability to speak, write

and/or understand English, in and of itself, does not automatically give a petitioner reasonable

cause for failing to know about the legal requirements for filing his claims." *Cobas v. Burgess*,

306 F.3d 441, 444 (6th Cir. 2002).  The court in *Cobas* noted that the petitioner had clearly been

able to communicate with the person who helped draft various letters, post-conviction motions,

and the federal habeas petition at issue, belying any claim that his language difficulties prevented

him from filing his petition in a timely manner.  *Id.*  However, the Ninth Circuit, where a

petitioner asserted that a lack of access to Spanish-language legal materials prevented him from

learning about AEDPA's deadline and thereby prevented his timely filing, and where he only

found a bilingual inmate willing to help him after the deadline had already passed, ordered an

evidentiary hearing because the facts petitioner alleged, if true, could have entitled him to

equitable tolling.  *Mendoza v. Carey*, 449 F.3d 1065 (9th Cir. 1065).  This Court agrees that under

the relevant precedent, an inability or significant difficulty speaking, reading and writing, or

understanding English does not, by itself, justify equitable tolling in habeas cases, where such

lack of proficiency has not prevented the petitioner from accessing the courts.

     Petitioner also references erroneous advice given to him by his appellate counsel

regarding the statute of limitations for bringing a federal petition. In a letter to Rodriguez at the conclusion of his representation, sent just after filing a U.S. Supreme Court writ application, Rodriguez appellate counsel wrote that he "will have one year from the U.S. Supreme Court's ruling [on his writ application from direct review] to bring a federal habeas corpus action." State Rec. Vol. 4, Tab 10. He goes on to advise Rodriguez that "if you have any other issues to raise that I have never raised, you will have to bring them in a state postconviction application before you file a federal petition application." As discussed above, this advice regarding the length of time Rodriguez had to file his application was plainly incorrect under current Fifth Circuit precedent - the time that elapsed between when Rodriguez conviction had become final and when he filed his application for post-conviction relief to reinstate his appellate rights (resulting from his trial counsel's error) had significantly drained his limitations period. Of course, his counsel's advice regarding the limitations period itself was not unreasonable; *Salinas* would not be decided until over four months later, in January of 2004.[6] Rodriguez apparently took his counsel's advice regarding his need to pursue post-conviction relief claims literally, seemingly believing that he was required to bring any other issues before filing his federal petition. After his claims (claims three through seven of this petition) were rejected on procedural grounds for failure to raise them on direct appeal, his counsel was forced to clarify what had been confusing advice:

---

[6] The Court notes that the *Salinas* holding was reached after a rather extensive discussion of AEDPA, case law, and the classification of applications for out-of-time appeals as direct and collateral review under a particular state's rules; the conclusion of the court, though well-reasoned, would not have been obvious prior to the ruling even to an experienced criminal appellate attorney, and the subtle distinctions it relied on could easily escape even a diligent *pro se* habeas petitioner.

> In advising you about where to go after your direct appeal was final, I see that I should have given you more explicit instructions.  When I told you that you would have to go to state postconviciton if you had any issues to raise that I did not raise for you, I should have explained that such issues include ineffective assistance of counsel, *Brady* evidence, newly discovered evidence, or any other such matter [sic] that ***could not have been raised on direct appeal***.  Because you raised issues that could have been raised on direct appeal, they were rejected for that reason.
>
> I did not raise the issues that you raised because if I thought those were good issues, I would have raised them myself...

Letter of November 22, 2004, State Rec. Vol. 22, Ex. 1 of application for supervisory writ to Louisiana Supreme Court (emphasis in original).  Unfortunately, petitioner spent 303 days (during which his limitations period under AEDPA had quietly lapsed) pursuing claims his attorney had thought weak, because of  his former counsel's advice that he would  "*have to* bring them in a state postconviction application before you file a federal petition application before you file a federal petition" (emphasis added).  The petitioner, based on language that counsel later conceded was confusing, understood that he was required to bring such claims before he could bring his federal petition.  This compounded the prejudice caused by inaccurate advice about his remaining limitations period.  Indeed, in the second letter (this one written almost a year after *Salinas* was decided), petitioner's former appellate counsel repeats and confirms his erroneous advice regarding his remaining limitations period: "The time you have spent on postconviction will not count against the one year that you have to file the federal petition so you still have time to file a federal petition."[7]

---

[7] Of course, this additional confirmation of the previously erroneous advice did not add to petitioner's predicament: his limitations period had already lapsed by the time this letter was written.

The Fifth Circuit has held that extraordinary circumstances that justify equitable tolling exist where a petitioner is misled by an affirmative, but incorrect, representation of a district court on which he relied to his detriment.  *Patterson*, 211 F.3d at 931-32.  It has also held that an attorney's intentional deceit could warrant equitable tolling, where a petitioner shows that he reasonably relied on his attorney's deceptive misrepresentations.  *Wynn*, 292 F.3d at 230-31. However, "mere attorney error or neglect is not an extraordinary circumstance such that equitable tolling is justified."  *Cousin*, 310 F.3d at 849.  The Fifth Circuit found support for this holding in the rule that prisoners are not entitled to counsel during habeas proceedings and thus cannot state a claim for ineffective assistance during habeas proceedings.  *Id.* at 848-49.  It found that a contrary holding would lead to perverse results, in that the procedural errors of trained attorneys would be dealt with less harshly than would be mistakes made by *pro se* litigants (as a petitioner's own ignorance or mistake is insufficient to warrant equitable tolling).  *Id*. at 849.  In *Riggs*, counsel retained by petitioner to file a motion for collateral relief under 28 U.S.C. § 2255[8] had advised him of the wrong time for filing his motion, advice similar to that given by Rodriguez' appellate counsel.  The court followed *Cousin* and other precedent in concluding that "'counsel's erroneous interpretation of the statute of limitations provision cannot, by itself, excuse the failure to file [petitioner's] habeas petition in the district court within the one-year limitation period.'"  *Riggs*, 314 F.3d at 799, *quoting Fierro,* 294 F.3d at 683.

In *Cousin*, *Riggs*, *Fierro* and *Wynn*, the petitioners were represented by counsel in their

---

[8] The Fifth Circuit has repeatedly recognized that the limitations periods for §§ 2254 and 2255 are nearly identical, and have consistently cross-applied case law discussing each to the other, so long as the particular context did not render it improper to do so.  *See, e.g., Patterson*, 211 F.3d at 930.

habeas petitions.  Here, after sending his letter erroneously advising Rodriguez of his limitations

period, petitioner's appellate counsel ended the representation.  Rodriguez was left to pursue

further relief by himself.   Unlike in the cases above, petitioner did not have the continuing aid of

counsel (during which perhaps his counsel would have realized the error).  Though it is true that

petitioner was not affirmatively mislead by an opposing party, or actively deceived by his

counsel, it would be more unfair in this situation to attribute his appellate counsel's error to

petitioner than in a normal, ongoing attorney-client relationship.  And rather than presenting a

possibility of the perverse results that concerned the Cousin court (if petitioners represented by

experienced counsel were treated more leniently when their attorney erred than *pro se* petitioners

proceeding on their own), here it is a *pro se* petitioner, without further aid of counsel, who has

been injured.  Indeed, not only did Rodriguez not have the continuing aid of counsel, the

combination of his former attorney's confusing advice about pursuing additional claims in state

court prior to filing his federal petition and the erroneous advice about his limitations period,

seems to have left him far worse off than if he had received no advice from his appellate counsel

regarding his further options at all.   It must be noted that Rodriquez very quickly filed his

federal petition within 40 days of the final denial by the Louisiana Supreme Court of his post-

conviction writ application, and well within the "one year" time frame set out by appellate

counsel in his two letters.  As far as he was aware from the explicit advice on the statute of

limitations, Rodriguez timely filed his federal petition, and only discovered that he may not have

when the State filed its response.  (In light his relative promptness, because of his thorough

petition and subsequent traverse, and his dogged-pursuit of every last possible claim, even those

22

his former counsel considered un-meritorious, this Court can only conclude he has been sufficiently "diligent" to warrant equitable tolling if it is otherwise justified.)

As noted above, courts are to look to the facts and circumstances of each particular case in determining whether equitable tolling is warranted.  Petitioner's appellate counsel's "erroneous interpretation of the statute of limitations provision cannot, *by itself*, excuse the failure to file petitioner's habeas petition" during the AEDPA limitations period.  *Riggs*, 314 F.3d at 799 (emphasis added).   Nor does the petitioner's "difficulty speaking, writing, and/or reading, *in and of itself*, automatically give petitioner reasonable cause for failing to know the legal requirements for filing his claims." *Cobas*, 306 F.3d at 444 (emphasis added).  But in this case, the particular combination factors, including attorney error and lack of English language proficiency, may be "rare and extraordinary circumstances" that warrant equitable tolling, especially in consideration of Rodriguez' diligence.  The unexplained failure of his trial counsel to timely move to appeal cost him a significant portion of his limitations period.[9]  His appellate counsel's confusing advice regarding the necessity of pursuing further claims in state court prior to filing a federal petition, his failure to appreciate the subtle distinction in Rodriguez' case governed by *Salinas*, and his explicit statement that petitioner had his full one-year period remaining under AEDPA put Rodriguez at further and significant disadvantage.  Rodriguez' asserted poor English language skills could have made this disadvantage, even with the aid of

---

[9] Though this Court concluded above that this failure alone did not itself justify equitable tolling, particularly because the state court granted him relief from this failure by restoring his direct appeal rights, it is still appropriate to consider it as part of the "facts and circumstances" of this case in light of the other factors that exist here.

someone else in prison in preparing his petition, impossible to overcome.  This Court finds that such a combination of factors could amount to "rare and extraordinary circumstances" such as would warrant equitable tolling.

In this case, however, it is not clear whether any alleged lack of proficiency additionally impacted petitioner's ability to access the courts or prevented him from learning the accurate AEDPA deadline for timely filing.  Petitioner merely asserts that he has "possessed difficulty with speaking, reading, and writing the English language."  Rec. Doc. 14 at 2.  There is some evidence that he possessed enough ability with English to adequately prepare his federal petition.  He was able to prepare the instant petition, perhaps with the aid of someone else in prison.  Moreover, one of his substantive claims includes an argument that the interpreter at trial (of Jorge Serrano's testimony) failed to properly interpret accurately everything Serrano said.  This concern was raised by defense counsel, at trial, based on petitioner's contemporaneous accusations that the interpretation was not accurate.  Rec. Doc. 1, petition at 8-12.  Petitioner could only have made such allegations if he was sufficiently able to understand, *in English*, the interpreter's translation.  Beyond merely asserting his difficulty, petitioner does not explain, or provide evidence, of how he was prejudiced in preparing his claim.[10]  As a result, this Court can not conclude that the facts of this case warrant equitable tolling without an evidentiary hearing to

---

[10] The Court notes one particular way in which a non-English reader may have been especially prejudiced in the circumstances of this case: in order for petitioner to have overcome his appellate counsel's erroneous advice regarding the statute of limitations, he would have had to have promptly discovered (as it had not even been decided until a significant additional period had lapsed) and understood the implications of *Salinas* to his case.  This would have been difficult for any petitioner confined to prison, where presumably up-to-date, "Shepardized" or "KeyCited" electronic materials are not readily available.  It may have been impossible for a non-English reader to discover and absorb the implications of *Salinas* in time.

examine petitioner's English language ability and the availability of either Spanish-language legal materials in his prison, or sufficient other aid available to him there.  Such a hearing is unnecessary, however, because the Court finds that on the merits of his claims, petitioner is not entitled to relief.

III.  PETITIONER'S CLAIMS

### A. Standard of Review

AEDPA revised 28 U.S.C.§ 2254(d)(1) and (2), furnishing new standards of review for questions of fact, questions of law, and mixed questions of law and fact for habeas petitions. The statute now provides that if a state court has adjudicated a claim on the merits, pure questions of law and mixed questions of law and fact are reviewed under 28 U.S.C.§ 2254(d)(1). *Hill v. Johnson*, 210 F.3d 481, 485 (5th Cir. 2000).  Questions of fact are reviewed under 28 U.S.C.§ 2254(d)(2). *Id.*

Regarding questions of law and mixed questions of law and fact, a federal court must defer to the state court's decision unless it was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C.§ 254(d)(1).  The United States Supreme Court has noted:

§ 2254(d)(1)'s "contrary to" and "unreasonable application" clauses have independent meaning.  A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in our cases, or if it decides a case differently than we have done on a set of materially indistinguishable facts. The court may grant relief under the "unreasonable application" clause if the state court correctly identifies the governing legal principle from our decisions but unreasonably applies it to the facts of the particular case. The focus of the latter inquiry is on whether the state court's application of clearly established federal law is objectively unreasonable, and . . . an unreasonable application is different from an incorrect one. *Bell*

25

*v. Cone*, 535 U.S. 685, 694 (2002) (internal citations omitted).

As to questions of fact, a state court's factual findings are presumed to be correct and a federal court "will give deference to the state court's decision unless it was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." *Hill*, 210 F.3d at 485; 28 U.S.C.§ 2254(e)(1).

### B. Petitioner's Claims

Petitioner raises the following claims in his petition:

1.   Whether the (Louisiana) Fifth Circuit's reliance on the trial court's ruling denying post-conviction relief denied the petitioner due process;

2.   Whether the (Louisiana) Fifth Circuit's reliance on the trial court's denial and failure to address the merits of appellate counsel's ineffectiveness during direct appeal proceedings deprived the petitioner of due process and equal protection, including his Sixth Amendment right to effective appellate counsel;

3.   Whether Petitioner's constitutionally guaranteed right of appeal and judicial review based upon a complete record was violated by translator Charles Johnson's failure to interpret the entire criminal trial proceedings testimony [sic] of critical defense witness Jorge Serrano for proper transcribing;

4.   Whether it was constitutional error to conduct criminal trial proceedings before the jury during the unwarranted absence of the petitioner, especially once counsel had requested that the proceedings not occur without the defendant's presence;

5.   Whether the trial court committed constitutional error by failing to replace jury foreman

26

Parker and failing to conduct a hearing or make any investigation into the alleged sleeping juror;

6.      Whether it was constitutional error for the trial court to allow a juror to question a witness;

7.      Whether prosecutorial misconduct occurred during the petitioner's criminal trial while witnesses were testifying and at the stage of closing and rebuttal arguments which constitute plain error, misconduct so egregious that it seriously affected the fairness, integrity, or public reputation of judicial proceedings and deprived the petitioner of a fair trial;

8.      Ineffective assistance of appellate counsel; and,

9.      Trial court error in not considering the reply to the State's response.

The State argues that petitioner is not entitled to relief because claims one, two, and nine do not raise federal questions and thus are not cognizable claims in federal habeas review, that claims three through (parts of) seven are procedurally barred, that the remaining portions of his seventh claim were properly determined by the state courts to be without merit, and that claim eight is procedurally defaulted.

### 1. Claims One, Two, and Nine.

The State is correct in noting that the petitioner has failed, in these claims, to present a federal question for review.  Federal habeas relief is available only on behalf of a person in custody "in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. §

2254(a).   These claims, however, raise questions of state-court determinations of state

procedural rules and state law questions.   In essence, these claims question the procedural

propriety of the state trial court's dismissal of various claims of petitioner in his post-conviction

relief application (and the affirmance of that dismissal by the state appellate court).   The claims

dismissed are those raised as claims three through seven, and eight, in the instant petition.   While

the Court thus cannot review these claims as raising independent federal questions appropriate

for habeas review, the State itself notes that these "claims might be construed as asserting a basis

to excuse the procedural default" of claims three through seven.   Rec. Doc. 11, at 19.   The Court

finds this statement to be accurate, and again, construing this *pro se* petitioner's pleadings

liberally (see page 15, above), will consider these claims, in conjunction with claim eight, as

asserting a basis for excusing the procedural default of his other claims.   In essence, these claims

challenge the consistency and application of aspects of the state court review process that

resulted in claims three through seven being dismissed on procedural grounds, and alternatively,

argue that the procedural default was the result of ineffective assistance of counsel.   These

claims will be discussed as such in the next section.

### 2. Claims Three, Four, Five, Six, and Parts of Seven, and Eight

The State contends that five of Rodriguez' claims are in procedural default and are barred

from federal review.   Generally, a federal court will not review a question of federal law decided

by a state court if the decision of that state court rests on a state law ground that is both

independent of the merits of the federal claim and adequate to support that judgment. *Coleman v.*

*Thompson*, 501 U.S. 722, 731-32 (1991); *Glover v. Cain*, 128 F.3d 900, 902 (5th Cir. 1997), *cert.*

*denied*, 523 U.S. 1125 (1998); *Amos v. Scott*, 61 F.3d 333, 338 (5th Cir. 1995) (citing *Harris v. Reed*, 489 U.S. 255, 260, 262 (1989)).  The "independent and adequate state law" doctrine applies to both substantive and procedural grounds and affects federal review of claims that are raised on either direct or post-conviction review. *Coleman*, 501 U.S. at 731-32; *Amos*, 61 F.3d at 338.

This type of procedural default will bar federal court review of a federal claim raised in a habeas petition when the last state court to render a judgment in the case has clearly and expressly indicated that its judgment is independent of federal law and rests on a state procedural bar.  *Harris*, 489 U.S. at 263; *Glover*, 128 F.3d at 902.  When the last state court judgment does not indicate whether it is based on procedural default or the merits of a federal claim, the federal court will presume that the state court has relied upon the same grounds as the last reasoned state court opinion. *Ylst v. Nunnemaker*, 501 U.S. 797, 802 (1991).  In this case, the trial court, in its October 25, 2004, ruling, dismissed the third through sixth claims because of petitioner's failure to raise those claims on appeal, and the seventh claim (regarding prosecutorial misconduct) as repetitive and successive.  State Rec. Vol. 3, Tab 6.  On November 2, 2004, the court denied relief on the ineffectiveness of counsel claim on the grounds of *res judicata* and repetitiveness. *Id.*, Tab 7.  The court relied upon LA.CODE CRIM.P. art. 930.4 in denying petitioner's third through seventh claims for relief,[11] and ruled that:

---

[11] La. Code Crim.P. art. 930.4 reads in its entirety:

Art. 930.4. Repetitive applications
A. Unless required in the interest of justice, any claim for relief which was fully litigated in an appeal from the proceedings leading to the judgment of conviction and sentence shall not be considered.
B. If the application alleges a claim of which the petitioner had knowledge and inexcusably failed to raise in the

> Upon review, the defendant's assignements of error [federal claim three] through [federal claim six] should have been raised on appeal.  The defendant is procedurally barred from raising this claim on post-conviction application and has not explained why he failed to raise this particular issue in an earlier proceeding.  *State ex rel. Kenneth W. Rice v. State of Louisiana,* 749 So.2d 650 [99-KH-0496] (La. 1999).  Thus, the defendant is not entitled to relief sought.
>
> As to assignment of error [federal claim seven], the State claims that the defendant's allegations of prosecutorial misconduct are repetitive.  An examination of the record reveals that the Fifth Circuit, NO. 02-KA-334, already addressed similar issues, in part, in its opinion.  The defendant's current claims are repetitive and successive.

October 25, 2004 Decision, State Rec. Vol. 3, Tab 6.  The Louisiana Fifth Circuit found no error in trial court's ruling, State Rec.Vol. 5, Tabs 11 and 12,  and the Louisiana Supreme Court denied the subsequent writ without reasons.  State Rec. Vol. 22, Tab 17.  Thus, the trial court's ruling was the last reasoned decision on the issue.  *Ylst*, 501 U.S. at 802.

Therefore, it appears the state courts barred review of Rodriguez' claims based on procedural default pursuant to LA. CODE CRIM. P. arts. 930.4(C), (D) and/or (E).[12]  This Court must consider whether the bar prohibits consideration of the claim on federal habeas corpus review.  For this state-imposed procedural bar to prevent review by this federal habeas court, the bar must be independent and adequate.

---

proceedings leading to conviction, the court may deny relief.

C. If the application alleges a claim which the petitioner raised in the trial court and inexcusably failed to pursue on appeal, the court may deny relief.

D. A successive application may be dismissed if it fails to raise a new or different claim.

E. A successive application may be dismissed if it raises a new or different claim that was inexcusably omitted from a prior application.

F. If the court considers dismissing an application for failure of the petitioner to raise the claim in the proceedings leading to conviction, failure to urge the claim on appeal, or failure to include the claim in a prior application, the court shall order the petitioner to state reasons for his failure. If the court finds that the failure was excusable, it shall consider the merits of the claim.

[12] The trial court's November 2, 2004 ruling regarding the ineffectiveness of counsel claim is discussed more below.

### a. Independent State Ground

A procedural restriction is "independent" if the state court's judgment "clearly and expressly" indicates that it is independent of federal law and rests solely on a state procedural bar. *Amos*, 61 F.3d at 338. For the reasons outlined above, there is no question that the State Trial Court relied exclusively on rules of Louisiana procedural default, independent of federal law, in reaching its decision. *See e.g.*, *Bennett v. Whitley*, 41 F.3d 1581 (5th Cir. 1994) (Art. 930.4); *Washington v. Cain*, 2000 WL 863980 (E.D. La. June 27, 2000) (Art. 930.4).

### b. Adequate State Ground

The question of the adequacy of a state procedural bar is itself a federal question. *Douglas v. Alabama*, 380 U.S. 415, 422 (1965); *Jenkins v. Gramley*, 8 F.3d 505, 507 (7th Cir. 1993). To be "adequate," the state procedural rule must be strictly or regularly followed and evenhandedly applied to the majority of similar cases. *Glover*, 128 F.3d at 902 (citing *Amos*, 61 F.3d at 339). A state procedural bar is presumptively adequate when the state court expressly relies on it in deciding not to review a claim for collateral relief. *Id*. This federal habeas court must therefore evaluate the adequacy of the rules applied to bar Rodriguez' claims.

In doing so, a federal habeas court does not sit, however, to correct errors made by state courts in interpreting and applying state law. *Narvaiz v. Johnson*, 134 F.3d 688, 695 (5th Cir. 1998) (quoting *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990); and citing *West v. Johnson*, 92 F.3d 1385, 1404 (5th Cir. 1996)); *accord Turner v. Johnson*, 46 F.Supp.2d 655, 674 (S.D. Tex. 1999). Rather, a federal habeas court's analysis

31

focuses on due process considerations, and due process requires only that the Court grant the

writ when the errors of the state court make the underlying proceeding fundamentally unfair.

*Neyland v. Blackburn*, 785 F.2d 1283, 1293 (5th Cir. 1986) (citing *McAffee v. Procunier*, 761

F.2d 1124, 1126 (5th Cir. 1985)); *Lane v. Jones*, 626 F.2d 1296 (5th Cir. 1980)).

      In keeping with this rule, a state procedural rule that is applied arbitrarily or in an

unexpected manner may be considered inadequate to prevent federal review. *Martin v. Maxey*,

98 F.3d 844, 847 (5th Cir. 1996); *Prihoda v. McCaughtry*, 910 F.2d 1379, 1383 (7th Cir. 1990).

> A federal court may not second-guess a state court's rule of procedure, but must
> evaluate whether the rule was actually applicable on the particular facts of the case.
> Otherwise, state courts could disregard federal rights with impunity simply by using
> the word "waived."

*United States ex rel. Bradley v. Clark*, 2002 WL 31133094 at \*4 n.2 (N.D. Ill. July 18, 2002).

For this reason, when state courts apply a procedural bar that has no foundation in the record or

basis in state law, the federal courts need not honor that bar. *Davis v. Johnson*, 2001 WL 611164

at \*4 n.10 (N.D. Tex. May 30, 2001); *see also*, *Johnson v. Lensing*, 1999 WL 562728 at \*4 (E.D.

La.) (J. Berrigan) (Art. 930.8 bar was not adequate because it was not properly applied under the

circumstances of the case); *Poree v. Cain*, 1999 WL 518843 (E.D. La.) (J. Mentz) (Art. 930.8

was not adequate to bar review because it was misapplied). However, where such a basis exists

in state law, the bar must stand.

      As noted above, the basis for dismissal of these claims was the state procedural ground

found in LA. CODE CRIM. P. arts. 930.4(C) and (D) and/or (E), which respectively provide for

dismissal of a post conviction application if it raises a claim which should have been raised on

32

appeal, or if it is a successive application that fails to raise a new or different claim and/or raises a new or different claim that was inexcusably omitted from a prior application.   According to the reasons given by the trial court, Rodriguez should have raised the third through sixth claim on appeal, and his allegations of prosecutorial misconduct were repetitive and successive.

As discussed above, petitioner's first, second and ninth claims could be construed as an argument that the trial court (and the higher state courts, by failing to correct the trial court) applied the state rules arbitrarily, or inconsistently, so as to make them inadequate to prevent federal review.   Petitioner argues that the trial court failed to order him to explain why he had not submitted his claims in earlier proceedings as required by art. 930.4(F), and subsequently failed to consider the merits of his reply to the state's response, in which he raised the issue of ineffective assistance of counsel as an explanation.

However, petitioner's applications utilized the *Uniform Application for Post-Conviction Relief*, the use of which is required by LA. CODE CRIM.P. art. 926(D).  State Rec. Vol. 4, Tab 8. This form provides specific information to the petitioner regarding repetitive applications, including the possibility that his claims would be dismissed.  A specific space was provided on which he could explain the reasons for his failure to raise the claim previously.   In reviewing a habeas petition that raised a similar claim that the state court had failed to order this Court has explained:

> Louisiana courts have determined that this opportunity-to-explain on the Uniform
> Application provides the district judge with the information needed to exercise her
> discretion on whether to procedurally default the application.  *See Rice v. State*, 749
> So.2d 650 (La. 1999).  "Proper use of the Uniform Application thus satisfies the
> requirements of Art 930.4(F) without the need for further filings, formal proceedings, or

33

> a hearing." *Id.*  Therefore, Petitioner's argument that procedural default is inapplicable is a non-starter because the trial judge is deemed to have complied with art. 930(F) by virtue of the petitioner's having filed a Uniform Application.

*Hess v. Cain*, 2005 WL 1038558, *3 (E.D.La) (J. Berrigan).  Thus, the failure of the trial court to independently order additional filings from the petitioner before denying his claims pursuant to art. 930.4 does not render the state grounds inadequate or excuse the procedural default.  Under these situations, art. 930.4(C) and (D)/(E) was adequate support for the state courts' conclusion that post-conviction review of his claims was barred.

However, this Court will construe petitioner's ineffective assistance of counsel claim (claim eight) as asserting cause for his procedural default, and the Court independently reviews that claim as such in the next section.[13]  Rodriguez will be excused from these procedural bars to review if he can show cause for his failure to raise the claims properly and prejudice from the failure to review the claims.

### c. Cause and Prejudice

To establish a cause for his procedural default, Rodriguez  must demonstrate that "some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488 (1986).  Even under a broad reading, he has not demonstrated in his pleadings the existence of any objective factor external to the

---

[13] In its November 2, 2004, the state trial court denied relief on this claim on the grounds that the instant filing was "repetitive and *res judicata*."  State Rec. Vol. 3, Tab 7. The court stated it had "previously ruled on the same issues in its order of October 25, 2004." Id.  It is not fully clear how such a claim was, or could have been, "repetitive" - petitioner only raised it in reply to the state's response, in order to show cause why he had not raised his other post-conviction relief claims on direct review.  As this claim does not, and never did, state independent grounds for relief - it merely argues why this Court should reach the merits of his other procedurally defaulted claims, this Court will consider it independently as asserting cause for the procedural default.

34

defense that impeded his ability to raise these claims in a procedurally proper manner.

Furthermore, "the mere fact that counsel failed to recognize the factual or legal basis for a

claim, or failed to raise the claim despite recognizing it, does not constitute cause for procedural

default." *Murray*, 477 U.S. at 486; *see also*, *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000) (a

petitioner must first prove that counsel's actions were constitutionally deficient before such a

claim can stand as cause for a procedural default).  Petitioner argues, in his eighth claim for

relief, that he obtained ineffective assistance of appellate counsel when his counsel failed to raise

the above procedurally defaulted claims on direct appeal.[14]   The Court has reviewed Rodriquez'

claim of ineffective assistance of counsel and finds there was no deficiency in appellate

counsel's performance in failing to raise these claims.  Appellate counsel need not advance every

argument, regardless of merit, urged by an appellant.  *Evitts v. Lucey*, 469 U.S. 387, 394 (1985),

*citing Jones v. Barnes*, 463 U.S. 745 (1983).   The Supreme Court noted in *Jones* that

experienced advocates have emphasized the importance of "winnowing out weaker arguments on

appeal and focusing on one central issue if possible, or at most on a few key issues," and that "a

brief that raises every colorable issue runs the risk of burying good arguments." *Jones*, 463 U.S.

at 751, 753.

In this case appellate counsel raised numerous claims on direct appeal - even making a

---

[14] Petitioner also argues that his counsel was ineffective because he erroneously told him, in his August 27, 2003 letter discussed above, that his only method of pursuing unraised claims was through state post-conviction relief, and that this dissuaded him from supplementing his claims on direct appeal.  However, as the state notes, counsel did not misinform him or mislead him as to his further rights in this regard because the direct review process was already concluded in state court by this point.  Thus any independent claim or assertion of cause for procedural default based on this ground is dismissed.

rare request that he be allowed to file a brief in excess of page limitations, State Rec. Vol. 19, Tab 15, and clearly exercised his professional judgment in selecting the most meritorious claims. As appellate counsel noted in his November 22, 2004 letter to petitioner: "I did not raise the issues that you raised because if I thought those were good issues, I would have raised them myself."  Under the highly deferential standard afforded counsel's strategy under *Strickland v. Washington*, 466 U.S. 668 (1984), the Court cannot find that appellate counsel's performance was deficient.  Therefore, petitioner was not rendered ineffective assistance of appellate counsel, and this claim does not stand as cause to excuse the procedural bar.  Rodriguez, therefore, has not shown cause for his failure, or his counsel's failure, to properly raise these claims in state court.

"The failure to show 'cause' is fatal to the invocation of the 'cause and prejudice' exception, without regard to whether 'prejudice' is shown." *Hogue v. Johnson*, 131 F.3d 466, 497 (5th Cir. 1997) (citing *Engle v. Isaac*, 456 U.S. 107, 134 n.43 (1982)). Thus, having failed to show an objective cause for his default, the Court need not determine whether prejudice existed and Rodriguez has not alleged any actual prejudice.  *See Ratcliff v. Estelle*, 597 F.2d 474 (5th Cir. 1979) (citing *Lumpkin v. Ricketts*, 551 F.2d 680, 681-82 (5th Cir. 1977)).

Rodriguez' third through (parts of his) seventh claims therefore procedurally barred from review by this court.  *See Trest v. Whitley*, 94 F.3d 1005, 1008 (5th Cir. 1996) (habeas review precluded when petitioner neglected to allege actual prejudice and cause of failure to comply with state procedural rule concerning time restriction on filing for state post-conviction relief), *vacated on other grounds*, 522 U.S. 87 (1998).

### d. Fundamental Miscarriage of Justice

Rodriguez' only remaining means of escaping this bar is if he can establish that a fundamental miscarriage of justice will occur if the merits of his claims are not reviewed. *Hogue*, 131 F.3d at 497 (citing *Sawyer v. Whitley*, 505 U.S. 333, 339 (1992)). To establish this, a petitioner must provide the court with evidence that would support a "colorable showing of factual innocence." *Kuhlmann v. Wilson*, 477 U.S. 436, 454 (1986); *accord Murray*, 477 U.S. at 496; *Glover*, 128 F.3d at 902. "To satisfy the 'factual innocence' standard, a petitioner must establish a fair probability that, considering all of the evidence now available, the trier of fact would have entertained a reasonable doubt as to the defendant's guilt." *Campos v. Johnson*, 958 F. Supp. 1180, 1195 (W.D. Tex. 1997) (footnote omitted); *Nobles*, 127 F.3d at 423 n. 33 (actual innocence factor requires a showing by clear and convincing evidence that "but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.")

Rodriguez has not pointed to any new or existing evidence which would create a reasonable doubt as to his guilt or which would establish his actual innocence of the crimes charged. *Murray*, 477 U.S. at 496.   When the petitioner has not factually established his actual innocence, his procedural default can not be excused under the "fundamental miscarriage of justice" exception.  *Glover*, 128 F.3d at 903.

Because Rodriguez has not met any exception to the procedural bar, his procedurally defaulted claims  must be dismissed with prejudice without review of the merits.

### 3. Remaining portion of Claim Seven

Because all of petitioner's other claims either do not independently present a federal

37

question, or are procedurally defaulted, the only claim that this Court would reach on the merits, if it found the petition warranted equitable tolling, would be parts of Rodriguez' seventh claim. This claim asserts that "prosecutorial misconduct occurred during petitioner's trial while witnesses were testifying and at the stage of closing and rebuttal arguments which constitute plain error, misconduct so egregious that it seriously affected the fairness, integrity, or public reputation of judicial proceedings and deprived the petitioner of a fair trial."  Though petitioner presents numerous examples of such alleged misconduct, many of them were dismissed by the state trial court as procedurally barred for failure to bring them on direct review, as discussed above.  Therefore, only those instances of alleged misconduct that were ruled on by the Louisiana Court of Appeal, Fifth Circuit on direct review would properly be before this Court if it found equitable tolling of the statute of limitations was warranted.  *See Rodriguez*, 02-334 (La. App. 5 Cir. 1/14/03), 839 So.2d 106, 134-37.

 The claims addressed by that court are discussed in turn.  Interested parties are directed to the Louisiana Fifth Circuit opinion for a full description of each instance of alleged misconduct and its context.  *Id.*

 The standard a federal habeas court applies in reviewing claims of prosecutorial misconduct is whether the prosecutor's remarks are of such a nature as to render the trial fundamentally unfair.  *Donnelly v. DeChristoforo*, 416 U.S. 637 (1974); *see also Harris v. Cockrell*, 3131 F.3d 238, 245 (5th Cir. 2002).  "[I]n a Section 2254 proceeding more than undesirability or even 'universal condemnation' must be shown.  Unless a specific guarantee of the Bill of Rights is involved, it must be shown that the remarks were so prejudicial that they

38

rendered the trial in question fundamentally unfair." *Cobb v. Wainwright*, 609 F.2d 754, 755-76 (5th Cir. 1980) (internal footnote omitted), *citing Donnelly*, 416 U.S. at 643.

Such fundamental unfairness exists "only if the prosecutor's remarks evince 'either persistent and pronounced misconduct or ... the evidence was so insubstantial that (in probability) but for the remarks no conviction would have occurred." *Harris*, 313 F.3d at 245 (internal quotations and citation omitted).  In reviewing prosecutorial remarks, the Fifth Circuit has identified three factors to be considered: 1) the magnitude of the prejudicial effect of the remarks; 2) the efficacy of any cautionary instruction given by the judge; and 3) the strength of the evidence supporting the conviction.  *See, e.g., Styron v. Johnson*, 262 F.3d 438, 449 (5th Cir. 2001).  Only where the prosecutorial comments substantially affect the defendant's right to a fair trial do they require reversal.  *Id.*

**a.  Prosecutor's request to the trial court that the same "courtesy" be extended to all of  the prosecution's lay witnesses after decedent's mother stated she would rather not give her address.**

Petitioner argues that this remark implied that the witnesses were afraid of the defendant. The trial court denied a motion for mistrial on this ground.   The state appellate court concluded that this remark did not contain any implication that the witnesses were endangered by the defendant, and that even if it was improper, it was not so prejudicial as to require reversal.

Though this Court is not as convinced that such a remark did not contain an implication that the witnesses were endangered by the defendant, it concludes that the state appellate court was reasonable in deciding that the comment did not substantially affect the rights of petitioner and that his trial was not rendered fundamentally unfair.

39

**b. Prosecutor's derogatory reference to petitioner's attorney.**

This comment was made while only the defendant, prosecutors and courtroom deputy were in the courtroom.  The jury was not.  After a hearing (on a Saturday) on the matter, the court instructed the prosecutor that the remarks were improper, and that he owed the defense counsel an apology.  The prosecutor readily complied.  The defendant moved for a recess until the following Monday so the defendant could calm down.  The trial court found that the comment did not so impact the defendant that the trial should be delayed, and the defense objected.

The Court agrees with the state appellate court that, because the remark was made outside of the presence of the jury, and because the defense did not begin its case until two days later and the defendant himself did not take the stand until six days later (diminishing any potential impact to the defendant's composure), it is hard to see how this remark prejudiced the petitioner.

**c. Prosecutor's improper laughter, facial expressions, and other conduct during defense witnesses' testimony.**

The petitioner lists various instances in which the prosecutor supposedly openly laughed, made faces, made sarcastic comments, and engaged in other improper behavior, in the presence of the jury, while defense witnesses were testifying.  After the defense pointed out each instance, the trial judge either admonished the prosecution, or sustained its objection.  The court did deny a request for a mistrial after one such incident, but petitioner did not contest this denial on direct review.  Although such behavior, if it did occur as described, is surely to be condemned, this

Court can not find under these circumstances that the state appellate court unreasonably applied the law regarding such behavior.  The Court will defer to that court's conclusion that the magnitude of the prejudicial effect of the behavior was not strong enough to warrant reversal. The trial judge made admonishments to the prosecution, at the defense's request, which reduced whatever prejudicial effect did exist.  Finally, the strength of the evidence supporting the conviction in this case, including the several witnesses to the murder who identified the petitioner and the evidence of a conspiracy between the petitioner and Jose Serrano to deceive the jury, weighed heavily against reversal.

This Court also finds that the Louisiana appellate court was reasonable in concluding that the accumulation of the prosecutor's actions did not warrant reversal.  Therefore, this claim is dismissed with prejudice.

### IV. CONCLUSION

Having considered the petition, the record, and the applicable law, the Court determines that the petitioner has not established that his state conviction presents grounds for the relief requested.  Accordingly,

IT IS ORDERED that the petition of Luis Rodriguez be hereby DENIED WITH PREJUDICE.  Judgment will be entered accordingly.

New Orleans, Louisiana, this 17th day of December, 2007.

HELEN G. BERRIGAN
UNITED STATES DISTRICT JUDGE

41